It's 14-1214 Flexiteek Americas v. PlasTEAK. Mr. Smiley, whenever you're ready. May it please the Court, my name is Scott Smiley, I represent Flexiteek Americas and with me at the Council table is Mark Johnson. I'm happy to find you today in a patent state of mind on another patent case. As this Court well knows, the process of determining patent infringement is a two-step process. Mr. Smiley, on page 29 of your opening brief, you say it's undisputed that the appellees provided the District Court with samples of the accused's devices before claim construction, but in the record at 4237, the District Court says we're not talking about the defendant's products. This is repeated several places. We're just talking about what your product is. Remember, you were the one who was very adamant that we not refer to the defendant's products. Other places, the Court says I'm not doing this looking at the defendant's products. Where in the record is there evidence that the District Court considered the defendant's product samples before constraining the claims? Your Honor, the defendant submitted with a markman brief photos of their products. In the record, on the transcript, the judge said she read both of our briefs and she ultimately decided to strike them after reading them. But she did read them and that's on the record, so there's no question there. But she also struck them, which meant she wasn't going to consider them. Your Honor, I think the piece of evidence that is most glaring to show that it was in her mind and she saw them, she can't unsee them, is when she, it was actually me that handed her... When a court says they're not considering something, you're saying they are anyway. I think it's difficult for a human not to recall what you've seen. When I personally handed her our product, and shortly thereafter, without her looking at the record, she said to the defense counsel, how did you lose this case? All she had seen is our product, and she's referring to when we won the jury verdict the first time. I think it's clear that that shows she made a conclusion, looking just at our product in her hand and noticing that we have very exaggerated... We've skipped over. I think Judge Wallach was asking about the defendant's product. Yes. And now you're talking about your product. Well, I'm trying to show the evidence that she knew what their products looked like, because when she saw ours, she said to them, how did you lose this case? The only way she could conclude that that was a surprise is by knowing there's a difference in what she was seeing and what their product looked like. And there is a drastic difference. The product we happened to be producing at the time of the trial had exaggerated slots, big grooves, and theirs did not have those grooves that were so evident. So if she hadn't have seen their product and known what it meant, I don't know why she would exclaim that sentence. What is it, the rule, that you want us to adopt with respect to viewing or being aware of the accused products? Your Honor, I understand that it is attractive for a judge to want to know before deciding the claim terms, to know what the product looks like, so they know why maybe one word is more important than another word. But it seems that it moves away from what we rely on to determine claim terms. Well, as long as the judge understands what the rules are, then the judge is not to deem the, construe the claims in light of either the commercial embodiment or the accused. But it does seem to me that it is useful for a court, as you say, to look at the product, just to have a sense of what the ballgame is about here. What matters, what doesn't matter, what are the claim construction issues that the court really needs to bear down hard on. And why is that, are you arguing that that's impermissible? We're arguing certainly that it's impermissible to look at a commercial product of a patent holder. The product had nothing to do with the negotiation between the patentee and the patent office. The product many times comes years after the patent is issued. It might not represent the breadth of the patent claims, as in our case, and it doesn't help us to see what was meant by the negotiators in achieving that patent issuance. So we do think strongly that the commercial embodiment should never be looked at until after claim construction is complete. The defendant's product, I know the case law, there have been certain cases that have talked about this, they allow the court to look at that. It doesn't seem, though, to fall into the methodology of determining what the claims mean. You should look at the claim language, the specification, the prosecution history, and then extrinsic evidence that might shed guidance on what the parties meant when they were arguing over those specific terms. The defendant's product doesn't fit in there. But I understand as a judge, you would want to look at that product to see why are these parties so viciously arguing over one particular one. So what's your answer to Judge Bryson? Yes, it's okay for the accused, the defendant's products, but not for the commercial embodiment? I would say both, that the court should not look at the defendant's product either. There's reversible error if the court looks at even, notwithstanding that the court does not then say, oh, and I'm going to construe the claim in light of the accused's product, or whatever. I would think it would be a better rule that the court not look at any product. But is it reversible error? Reversible error for the defendant's products? No, Your Honor. Right, okay. Reversible error for our client's commercial products? Yes, because it's akin to learning that a defendant has insurance. You're engaging in rank speculation when you say that the court looked at yours. You're saying, well, she must have. I handed it to her. She forced me to hand it to her. I objected in writing before the case, and I did hand it to her. It's, I think, no coincidence that when her claim construction order was issued, it included definitions or descriptions of those exaggerated features of our product. And this case is very clear what effect that had on her by looking at these products, because this is a strange case. These claims have been defined by seven different fact finders prior to her. We had a district court judge, which defined the claim in terms of no restrictions for size or depth. We won that case, that jury trial. During reexamination, we had three patent examiners who looked at the exact same record and said the specification doesn't support any limitations to size or depth. We then go to the Board of Patent Appeals and Interferences, the highest court at the patent office. They said the same thing. There's no limitations in these claims. That lack of limitation to size of the slots hurt us in that proceeding because our patent was invalidated. But that definition should still stand after it was decided by all those fact finders. This district court judge looks at our product and comes up with another opinion that's not supported by the record. She points to one item in the thousand pages of the history, the prosecution history. She looks at a declaration by our expert. This declaration, Dr. Rhee. We think it looked as though she tried to find a way for us not to win this case again. Why isn't the Rhee declaration pretty strong support for the district court's conclusion in this case with regard to claim construction? He's an expert, Your Honor, that we submitted. Some parties tell their experts what their opinion should be, I believe, and that's what it ends up being. This is not that case. This expert issued an opinion and some portions of it helped, some portions of it hurt. It's very inconsistent. If you look at paragraph three, he says... That sort of gives an air of credibility to it, doesn't it? Your Honor, it is what it is. If you look at his report, I don't believe he was being untruthful. He filed a supplemental report that said he didn't understand how to interpret claims. He tried to correct it and it was not considered. But if you look at his report, in paragraph three, he says nothing about slots. He says that the material itself makes this malleable and that that's a big improvement over the prior art and that it's the material. Two paragraphs later, he talks about these big grooves and that's the paragraph that the district court judge relied on about these grooves. On page 21, and this is an important page in our appendix, at 807, he says when he's talking about the prior art, he says the grooves should be invisible. You should not be able to see them. There should be hundreds on the bottom of the material. 807 is an important page because it directly contradicts the paragraph that the district court judge relied on. He's talking about a Baldwin reference. So in order to have a disclaimer of claim scope, there has to be a clear and unmistakable disclaimer. Here we have an expert that says three different things and then he admits he didn't quite understand how claim terms work. This isn't really a disclaimer, right? This is more in the nature of what is the definition of the terms that we're talking about, right? A disclaimer would be a case in which the definition is clear and you are saying not withstanding the definition, our claims do not extend. Yes, Your Honor. That is a doctrine. But it has to be clear and unmistakable. We don't have that here. We have, I'll give you a moment to read the very bottom of 807 where he's talking about the Baldwin reference. So this is a direct contradiction to the single paragraph that the district court judge relied on to force into the claims these limitations of material depth. What we were talking about earlier all came in in connection with the tutorial and the tutorial is generally something other than the Markman hearing. It's something to just give quick advice. If you're sitting there and you don't like the fact that she's grabbed onto your commercial embodiment in the tutorial and you think your expert statements need some explaining. And she said, do you want a Markman? And you said, no. Why is that? It was not an easy decision. We had a break. We went in the hallway and we tried to determine whether anything would be different at the Markman hearing. Again, I acknowledge... Don't you have to bear the responsibility for that? You argue all of the reasons why the commercial... To us, why the commercial embodiment, your product, was different than what the claims require. Presumably, you could have or you should have made that argument to the district court. And if you didn't take the opportunity you had to do that, why are we here to fix it? Your Honor, I did take the opportunity. Before the hearing, I objected in writing. I objected verbally to her. She had then still asked me to see the product. Once she's seen it and says to them, how did you lose this case? And in light of the fact that at that hearing, it was a three-hour hearing. We went through the entire prosecution history. We went through the claims. There was nothing at a Markman hearing that we would have shown that we didn't already show. There was absolutely nothing. We brought our experts to that hearing. It had every attribute of a Markman hearing. And in the hallway, when she asked if we wanted another one, it would have been an extra charge to our client. She's still seeing our product. We couldn't find any purpose to change the name. And there's no reference to your product in her actual opinion, right? There's no discussion? There is not, no, Your Honor. So you're just arising that obviously it was prejudicial because she looked at it and because she made this comment to your friend? A couple of things, yes. She made the comment to opposing counsel, how did you lose the case? She said it's like the McDonald's case because it was so surprising to her. It was on the record. And he responded back, the claim construction order, something to the effect that it was a way to fix that. Then she issues a claim construction order that varies drastically from, again, seven different fact finders that have looked at this case. Then we look at what she supported her opinion with. She supports it only with an expert report that was expressly disregarded by the three patent examiners during the re-exam and, again, expressly commented on and disregarded as not supported with any evidence by the Patent Office's highest court. So it appears to be a way of cherry picking one paragraph that would help her add these limitations to our claims that would make it hard to enforce. Even with that narrow limitation, we still had a chance to win this case. She took from us during summary judgment the ability to show that the defendant's product still has a slot when they put their panels together to make the sheet, which is what the claim requires. There are two-inch pieces that have repeating slots when you put the sheet together. We still could have won infringement on that. She didn't consider that, though. She considers one panel only in her opinion, her summary judgment opinion. She doesn't recognize that the claim requires a sheet of these panels. Can you return momentarily, I don't want to hold you up long on this, to page 807? I've read over 807 and I'm not seeing what it is on 807 that you think is squarely contradictory to Dr. Reed's earlier testimony. The one reference to the Whitaker patent is sort of 60%. It's the Baldwin patent she's referring to. Right, but she talks about the Whitaker patent, which is your patent, I guess, briefly. What is it about 807 that you think is inconsistent with other portions of Dr. Reed's declaration? Because I'm having a hard time seeing the inconsistency. It says, in order to accomplish the function, up near the top, in order to accomplish the function, the physical structure of the grooves or slots would have to be shallow enough to allow the glue to use it as a contact surface. So he's saying that you don't need any high depth. A couple sentences down he said, the structure pictured in figure four would have to be small and shallow and exist in numbers in the hundreds, so that the under surface appears flat to the naked eye. And that's what defendant's product looks like. It appears flat to the naked eye. The judge ignored the sentence and said our slot... This is talking about the Baldwin patent, but you say that is his way of saying that the Whitaker patent should be construed in this manner? He is referring to the slots of our invention and saying for Baldwin to achieve the same function of our material, the slots of Baldwin would have to be undetectable to the naked eye. There would have to be hundreds of them. This is what is on the bottom of the defendant's product. So again, he said in a couple different ways what this patent covers. And again, he's not understanding how to interpret claims. He's looking at the various embodiments of the patent. And in one of them, which the district court could have also relied on in her summary judgment to say, just like the first district court judge, just like the examination proceeding, just like the port of patent interference, the claim isn't limited to size and depth of the slots. It's slots that allow curving and allow it to adhere to the surface. I see that my time is up. We'll restore two minutes of rebuttal. And we'll add a couple minutes to your time. May it please the court, good morning. My name is Ronald Kopp. I'm here today representing the Appalachian Plastic End and Plastec. It's a pleasure to be here. Your Honor, this patent involved in this case does not teach nanotechnology. And yet, the appellants would now like it to do so. What it teaches, and I apologize for the delay, and I apologize for my cold, it teaches how to cause durable plastic flooring to bend around surfaces on a boat deck or some other surface. At the end of the day, we contend, Your Honors, that the case really comes down to two issues that have resolved in favor of the appellee cause anything else to go away. First is whether longitudinal slots should be defined in a way so as to include micro recesses visible only with an electron microscope. And secondly, whether longitudinal slots should be defined in a way to include not just grooves on the underside of a plank of the plastic, but also a hypothetical groove that might occur when the edges of two pieces of plastic come together. The answer to these questions really is found and has been alluded to already this morning in the specification of the 881 patent, which was how are we going to solve this problem? This problem that was presented by the proposition that TEQA, which has been around for a very long time on boat decking, is very hard to curve, is very hard to maintain. When one does curve it in application, one has to fasten it down with bolts or screws or some such thing. And it's very high maintenance and also not very durable. So Mr. Whitaker, the inventor of this particular patent that brings us here today, came up with a way to replicate this TEQA by way of making a flexible polymer, not wholly unlike lots of other polymer flooring that is out there, but in this particular case it would be flexible enough to curve around the shape of a boat deck and avoid being fastened by screws or other types of mechanical fasteners. There are a lot of flooring products out there, obviously. Most are extruded. All are flexible to one degree or another. The extruded plastic I saw in my hotel room this morning on the floor outside my bathroom could be curved if necessary to some degree. The challenge, though, that the inventor faced was to come up with a design that would allow significant curving so that we could go around corners or at least curves on a boat deck rigid enough to make wear and tear that occurs on a boat surface at the same time. And here the inventor came up with a solution, put grooves in the bottom. And if you do that, two things will occur. Number one, just by mechanical means, one will be able to take this more rigid piece of plastic and make it curve. That's been known for a while, but apparently other than in the Kemmerer patent to a small degree hadn't been applied before. But the other function that it has is it increases the underside, the square footage or inchage, if you will, of the underside so as to be more receptive to glue or other adhesive so that there's more of a surface for bonding and therefore screws or fasteners that are mechanical wouldn't be necessary. It was a good idea. What the appellant doesn't like here is that my client, Plastique, developed an alternative to using any of that. He began using a plasticizer that is non-migrating so as to avoid having to use any type of groove in his process. And in fact, he tried very hard to avoid even an argument of infringement by embossing the bottom so that one could not even make the argument that through the extrusion process that there could be minuscule grooves as the product is run through the die. So he embosses at the bottom to make it very rough and very irregular. But the appellants have tried to backdoor an infringement claim by asserting that the grooves called out in their patent include any defect, any defect whatsoever, as long as they can take that microscopic... Let me take you away from this for a while. During the proceedings below, Flexitique did express its objection to the district court viewing the party's commercial embodiments. Is that correct? It is correct, Your Honor. You argue on page two of your brief that they waived their objections with respect to the viewing of the products. But they did raise objections at various points. They did raise an objection. And the reason I'm asking you this is, working backwards, you argued that Flexitique should be sanctioned for its Fifth Amendment arguments. Page 11 of your brief. Yes. Do you recall that? I do. Why shouldn't you be sanctioned for making an argument that they waived their objections? Because, Your Honor, they made objections at the beginning of the proceeding. She appeared at some point to go along with them. Much later in the proceeding, as disclosed by the transcript, the court simply asked at that point, do you want to mark them? No, no, no. Well, later she did. Much later, she said, can I see what your product looks like and how it is manufactured? And Mr. Smiley says, sure. That's at page, well, it's at page three of our brief. But more than that, as the discussion continued, as the judge was viewing the product, Mr. Smiley went on and on about the differences in the product. He never at any time objected. He never at any time said, Your Honor, I would prefer not to answer that question. I've shown you my product. You ordered me to do that, but I object to doing anything else. Or I will answer that over an objection. My question is directed really to the fact that I don't like it when people seek sanctions against me for making an argument. I appreciate that, Your Honor. This has been a very, very difficult lawsuit with a great deal of... It's been a difficult lawsuit. I would, at this time and on the record, withdraw that motion for sanctions. So there are problems, Your Honor, with the assertion of these micro-defects. Let's go back a little bit to where Judge Wallach was taking us, which is the argument, which is a principle argument that your friend spends a lot of time on, which is I think he assumes that there ought to be a rule that says it's reversible error for the district court to consider in a commercial embodiment. And here he goes further to say that it clearly, unavoidably affected, infected, her ability to come to the right claim construction and discard that. Let's leave aside the equal protection arguments with respect to trolls and so forth. Right. But just on that question. So our view would be that that could be correct if it were apparent from the arguments being made and the discussion with the court being had in either the technology tutorial or in the marketing hearing, and then if it was apparent from the judge's claims construction decision that she had taken that into account significantly. Even a cursory reading of the transcript of the hearing would indicate that nearly all of the questioning related to, for example, the specification, the claims history, including Dr. Reed's many page long declaration. Yes, Judge Wallach? Well, I just think that we, somewhere within the standard of review, we have to, unless there's a really good reason, we have to take the court below's word when they say, I didn't do this. I was going to end with that. And she indicated that she understood what the law was and that she was going to abide by that law. And so we don't believe in those instances anyway that it is reversible error. So these defects that are nanometers in size and that are irregular are very, very different from anything that the art, or that the patent teaches in any respect. If one looks at the specification, if one looks at the figures, if one looks at the claim itself, but certainly if one looks at the information in the file wrapper, including the claim of Dr. Reed, or the statement of Dr. Reed, the declaration, it is very apparent when one tries to learn from that information what it is that is being taught. And one certainly is not being taught that he or she can develop a product that will bend in some significant way by this inadvertent leaving of marks through the manufacturing process. That would make absolutely no sense. Now as to these edges, I would start with the proposition, Your Honors, that every single piece of flooring is flat, and that every piece of flooring has an edge. I suppose there could be some old linoleum from my growing up days that is laid across the floor and doesn't have an edge, but certainly of the types that we're talking about, which are planks that come together, every piece has an edge. There is nothing in the claims history, there is nothing in the patent, that would teach anyone skilled in the art or otherwise that a groove is to be established by virtue of these pieces coming together. Pieces coming together has been known forever, and certainly has been known since polymer type flooring was developed a number of years ago. There is nothing being taught whatsoever in terms of all of that becoming grooves. There is some mention of an edge having an overlap or an underlap such that they come together and that that piece standing alone could be viewed to have at least a half a groove, I suppose, before it comes together. When it comes together, of course, the object is to get those pieces to come together as tightly as possible. The object is not to get them to come together in a fashion so that they will accept adhesive and cause that product to adhere more closely to the surface. These were not intended, these creases or interconnections were never intended to be a part of the grooving process that was invented by Mr. Whitaker, and they are not. Dr. Rhee stated, and I agree with you, as you might expect, Judge Bryson, that what Dr. Rhee says is pretty important because somebody trying to understand what it is that is to be made or manufactured or developed out of this patent is going to read the patent history and see what is it that they were trying to do. And Dr. Rhee explains the problem very, very well, very succinctly, and then he explains how the inventor went about it. But in terms of these edges coming together supposedly to make grooves, he says at page 789 of the appendix, and I'll just read two sentences of it. Quote, the inventor greatly enhanced the degree of flexibility that would have been inherent to the material itself by adding a series of longitudinal slots into a rib in a very tight pattern on the underside of the plank or sheet. The addition of these longitudinal slots creates the ability of the sheet or plank to curve around tighter and tighter curves where the mere inherent flexibility of the material would only allow curvature over very slight or gradual curves. The fact that a plank... I'm sorry, are you on 789? I intended to be on 789, Your Honor. I've lost my place then. Let me see if I can find it quickly. It is 789. Is it? Where on 789? Oh, about halfway in the bottom of the paragraph. You with me? Well, go ahead. Okay. I'm just missing it, but that's not... I can find it. I did... If it will help you, it's about halfway down, but I skipped several words. I have three dots after the inventor. Okay, well, go ahead. Oh, that may be the problem. Very good. All right. The fact that a plank has a slot will allow it to curve more than it inherently could. The fact that a plank has an edge is meaningless as all flat surfaces have edges. Edges are inherent to flat surfaces. The fact that edges of a plastic flooring piece coming together with another is anything but novel. And here we would submit that the planktists are grasping at straws. My clients want only to be able to permit... be permitted to manufacture their product in their small factory in Copper, Ohio, which they have been attempting to do with the burden of this lawsuit over their head now for many years. Their product is very different from the product at issue. It certainly accomplishes some of the same purposes, but in very different ways, and it is separately patented. There's nothing new about placing polymer products on a floor of any type to create the look of a wood substance. Happens every day, probably will happen to you by the end of this day. The fact is that these two parties have arrived with very different solutions to the problem that was presented. There is no infringement. The district court's judgment should be affirmed. Would you like to comment on the portion of Dr. Rhee's declaration that your opposing counsel referenced on 807? I gave it to him so that he would have it in front of him, so I wasn't able to follow it as closely. I wonder if you could point me on 807 to where it is that... Right, well, he's referencing the Baldwin patent, figure four of the Baldwin patent. Yes. I...he began to read, I think, with this section that says, in order to accomplish this function, the physical structure of the grooves would have to be shallow enough to allow the glue to be applied. To use it as a contact surface, i.e., the grooves could not be deep. I think that's what he's saying. And, yeah, I think that's the main... Yeah, and I've got... And would have to exist in numbers in the hundreds, but I guess the numbers in the hundreds is not necessarily consistent with your construction. I don't recall as well the Baldwin patent as I should. I certainly think that he was also attempting to distinguish the Kemmerer patent, where the grooves were huge, and he was trying to say that they would be much smaller. Nowhere is he indicating that these grooves would be in some fashion random and would be nanometers in size. That would be my only response, Your Honor. But I'm wondering about the glue adhesion factor. If you had, let's say, slots that are... Suppose the piece of wood is actually of some material thickness. Let's say half an inch thick, I don't know. And the slot is three-quarters of that distance. Glue is not typically going to go all the way up into a three-eighths of an inch slot, is it? It would be my guess that it would not always do that, depending upon the pressure used to put the material down. So, well, this may be committing the error that is at the center of this case. Typically in this art, how thick are these pieces of faux wood? Typically in the art, if the material is three-eighths of an inch thick, the slots will be about a quarter of that. I see. Okay. Thank you very much. If this were a different circumstance, if the patentee had taken one position during re-examination and saved the patent, and then taken an opposite position in litigation to win infringement, the error in that would be abundantly clear, and you probably would have decided this case on the briefs. It wouldn't be fair for a patentee to take a position to win and an opposite position to also win. In this situation, we have been forced to take one definition of our claims to lose our patent at re-exam, and then the district court gave us the opposite definition to make us lose in litigation. It's just as unfair. The lower court, I'm sorry, the patent office, twice looked at these claims and said, there's nothing in the specification to support a limitation to the claims. The only piece of evidence that the district court looked at to assign these definitions to the claims, the deeper definitions, was one paragraph of Reeves' declaration that is in contrast to the previous paragraph that discusses nothing about slots, and the end of page 21 where it talks about the slots are in the hundreds and undetectable to the naked eye. There's a difference between the standard employed by the PTO and the standard employed by district courts with respect to claim construction. Broad is reasonable construction versus the actual construction. Absolutely, Your Honor. It's not necessarily irreconcilable for the PTO to reach one result and the district court to reach a different claim construction. I completely agree, but hopefully both are logical steps to achieving a patent definition. The cases are clear. You look at the claims themselves, the claim language. There's no limitation to size or depth in the claim language. The specification, the district court said in her order, there's nothing in the specification to limit the depth or size. If you look in the prosecution history, there's nothing except for one paragraph of our expert who contradicted himself above, below that paragraph, and in a supplemental declaration said he didn't really understand how claim terms work. It's a complicated process. So to ignore the definitions that were given by seven different fact finders and that allowed this patent to reissue and then go the opposite direction is fundamentally unfair to plaintiffs. We ask that the lower court be reversed and that we be able to achieve a claim definition that relies on clear and unmistakable record evidence of what the patent intended. Okay. Thank you. We thank both counsel and the cases submitted.